479 So.2d 883 (1985)
Joe E. FRYAR,
v.
WESTSIDE HABILITATION CENTER, et al.
No. 85-CC-0670.
Supreme Court of Louisiana.
December 2, 1985.
Rehearings Denied January 9, 1986.
*884 Phillip Wittmann, Susan Talley, Judy Barrasso, Lawrence Orlansky, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for third-party applicant.
Marsha Jane Hopper, James A. Bolen, Bolen & Erwin, Ltd., Guy Humphries, Jr., Alexandria, for plaintiff-respondent.
William E. Skye, Alexandria, for defendant-respondent.
Gus Voltz, Jr., Voltz & Ware, Charles S. Weems, III, Gold, Little Simon, Weems & Bruser, H. Brenner Sadler, Provosty, Sadler & Delaunay, Charles F. Nunnally, III, Garrett, Ryland & Nunnally, William B. Owens, Crowell & Owens, Alexandria, Paul D. White, Mandeville, for third party-respondents.
WATSON, Justice.

ISSUE
The issues are whether Louisiana: (1) can; and (2) should exercise long-arm personal jurisdiction over Bert Davis, III, an Oklahoma resident formerly employed by the Penn Square Bank.

FACTS
An investment agreement between Penn Square Bank of Oklahoma City, Oklahoma, and the Bossier Bank & Trust Company of Bossier City, Louisiana, provided for delivery of $8,682,000 from the Bossier Bank to the Penn Square Bank for investment in collateralized certificates of deposit, bearing initial interest of 15.75% per annum. The collateral was to be delivered to a custodian, the Fidelity Bank of Oklahoma City.[1] Bert Davis, III, senior vice-president of the Penn Square Bank, executed the instrument on behalf of his Bank.
The funds were invested by Bossier as trustee on behalf of Westside Habilitation Center, a nonprofit corporation organized to build a facility for the mentally retarded at Cheneyville, Louisiana. Westside issued tax exempt bonds paying 14% per annum interest.
Three depositions of Bert Davis, III, are in evidence.[2] Davis testified that he was *885 Penn Square's senior vice-president in charge of the money center department, served on the asset and liability management committee, and reported to Jim Gunter, the chief financial officer of the bank.
Davis had been called around the end of March, 1982, by Bill Goldsmith of California, on behalf of Joe Hancock in Arkansas, about placement of C.D. money in a collateralized transaction. Davis advised Goldsmith, with whom the Bank had a finder's fee arrangement, that the Bank did not have any collateral available. Goldsmith later said that single family mortgages would be acceptable, and Jim Gunter advised Davis to try and negotiate the deposit.[3]
Davis' first conversation with Bossier Bank was on April 20, 1982, when the money was wired to Penn Square, and Keith Jones of Bossier called Davis to confirm the amount. Hancock had handled all the prior negotiations. Jones called again in connection with a construction draw on May 10th. Davis called Jones in June to ask if Jones wanted treasury bills in the collateral because it was going to take an extended period of time to get proper documentation on the mortgages, but Jones apparently gave a negative reply. Davis was not aware of exactly what documentation the Bossier Bank required on the notes and mortgages because the terms of the investment agreement were "hazy"[4] and "nebulous."[5]
On April 26th Davis advised Bossier by letter that he would deliver the mortgages and copies of the supporting documentation to the Fidelity Bank on April 28, 1982.[6] In fact, Davis delivered copies of the notes and mortgages. Fidelity advised Bossier, in a letter dated April 29, 1982, carbon copy to Davis, that the only items to be completed were receipt of the original mortgages and supporting documentation.[7] Davis had not previously been involved with transfers of collateral. After the copies were delivered to Fidelity, another bank employee advised Davis that Fidelity should have the original notes and mortgages. It was then his intention to deliver the original notes and mortgages to Fidelity to collateralize the deposits. In the middle of May, when a custody agreement was signed, the mortgages and notes had been segregated. Davis had said everything would be delivered by the middle of May, without realizing it would take so long to satisfy the legal requirements. By letter of June 4, 1982, Davis was requested by Fidelity to deliver the original notes and mortgages.
Davis did not realize that Penn Square was in jeopardy until June 30, 1982, when an expected capital injection of twenty to thirty million dollars was not received. At that time, he made no effort to inform anyone at Bossier about the financial condition of the Bank. Davis realized with certainty by Friday, July 2, 1982, that the Bank would not survive. Around 11:00 A.M. that Friday he was instructed not to pre-pay any C.D.'s. There was a run on the Bank; approximately thirty-five to forty million dollars were removed by depositors. The Bank opened for business on Saturday, July 3rd; Monday was a holiday; the Comptroller of the Currency closed the Bank as of Tuesday. Although Davis was aware the original mortgage notes needed to be delivered to Fidelity or Bossier, he was engaged in a frantic effort to keep the bank afloat. Davis admitted in deposition that he felt personally responsible for and personally involved with this particular matter.[8]
*886 Bert Davis, III, was named as a defendant by Westside Trust, an intervenor, and as a third party defendant by Westside Habilitation Center. Both alleged that Davis, an Oklahoma domiciliary, was transacting business within the State of Louisiana at all pertinent times as an employee and officer of Penn Square Bank of Oklahoma City, Oklahoma, a national bank. They further alleged that:
"On or about June 23, 1982, Davis informed Bossier, by telephone communication to Jones, that the compilation of the original collateral documentation had delayed its delivery, and he assured Jones that delivery to Fidelity was imminent." (Tr. 421)
It was alleged that Westside's damages were caused by the fault of Davis in the following:
"(a) Failure to deliver collateral to Fidelity within a reasonable time;
"(b) Failure to notify Bossier that Penn Square would be unable to satisfy the collateral requirements imposed by the Indenture so as to permit Bossier to withdraw the funds;
"(c) Other acts of negligence, whether by omission or commission, which might be proved at the trial of this cause."
After an exception to the jurisdiction was upheld, Westside Habilitation Center and Westside Trust amended to allege:
"Prior to the transaction at issue, Davis intended to and regularly did or solicited business in this State. National advertisements concerning Davis' and Penn Square's services were placed in National publications distributed in Louisiana, including the Wall Street Journal. In addition, Davis maintained regular contact with deposit brokers servicing clients nation wide including Louisiana. Davis sold certificates of deposit to Louisiana residents, and directly corresponded with customers in the State of Louisiana regarding their purchases of certificates of deposit issued by Penn Square." (Tr. 786)
"Davis also transacted business within the State of Louisiana insofar as the present transaction was concerned. In connection with the present transaction, Davis personally negotiated with Joseph Hancock, the agent for a Louisiana trustee, Bossier Bank, and a Louisiana issuer, Westside. Prior to entering into the transaction Davis knew he was contracting with a Louisiana bank, Bossier Bank, seeking to deposit in excess of $8,000,000 with Penn Square; that the contract required he and Penn Square to provide financial services to Bossier Bank, a Louisiana bank, including the forwarding to Louisiana of monthly payments of interest and monthly payments for the contractor, Fryar; that the proceeds of the bond issue to be deposited in Penn Square were to be used to build a mental health facility in Louisiana; and that without that deposit, the contractor could not get paid.
* * * * * *
"In connection with the present transaction, Davis contracted to provide financial services to Bossier Bank, a Louisiana trustee, in this state, including monthly payment of interest and monthly payment of amounts sufficient to pay the contractor.
* * * * * *
"Davis' contacts with the State of Louisiana as set forth above and in the following amended paragraphs subject him to the jurisdiction of this Court pursuant to the Louisiana Long-Arm Statute, La.R.S. 13:3201, et seq.

* * * * * *
"On or about April 5, 1982, counsel for the underwriters drafted an investment agreement (`Investment Agreement') to be executed by Penn Square and Bossier.

*887 Pursuant to negotiations conducted by Davis, with Hancock and Peck, among others, two modifications were made to the Investment Agreement, and the Indenture, including provisions that the collateral could be in the form of seasoned single family mortgages at a previously agreed upon rate of 15 ¾%. On or about April 8, 1982 Davis and Jones executed the Investment Agreement on behalf of Penn Square and Bossier Bank respectively, whereby Bossier agreed to invest $8,682,000 of the proceeds of the bonds and certificates of deposit at Penn Square.
* * * * * *
"Pursuant to the Investment Agreement, the construction fund certificate was to be rolled over every thirty days, allowing the trustee, Bossier, to withdraw an amount sufficient to pay the developer. Davis understood that without the monthly withdrawal from Penn Square, the developer, Fryar, would not be paid, and the facility in Louisiana would not be built.
* * * * * *
"Prior and subsequent to receipt of the funds Davis had several contacts with Bossier. On or about April 20th, Davis called Jones, inquiring about the delay in receiving the funds. On or about June 1st, Davis called Jones, inquiring about the amount to be withdrawn to pay the contractor. Davis wired funds on at least two occasions to Bossier for use in Louisiana.
* * * * * *
"On or about April 25, 1982, Davis notified Bossier by letter that certain identified mortgages would be delivered to Fidelity in order to secure the construction fund deposit, and that collateral for the debt service reserve deposit had been placed with Fidelity in the Oklahoma City branch of the Federal Reserve Bank of Kansas City, acting on behalf of Fidelity.
* * * * * *
"On or about April 29, 1982, Davis and Jones and Fidelity executed the custody agreement, providing that certain securities, including the residential mortgages, would be deposited with Fidelity to secure the funds deposited with Penn Square." (Tr., pp. 787-789).
The trial court overruled an exception to jurisdiction over Davis, and the Court of Appeal reversed.[9] A writ was granted to review the judgment.[10]

LAW
Under these allegations, Davis' tort liability in Louisiana would be based on LSA-C.C. art. 2316.[11]
Louisiana's Long-Arm Statute is LSA-R.S. 13:3201.[12] It is intended to encompass *888 the maximum jurisdictional outreach allowable under the United States Constitution.[13]
The basic due process requirement for jurisdiction over a person is minimum contacts with the forum state. International Shoe Company v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). An individual is not subject to the jurisdiction of a forum with which he has established no "contacts, ties or relations" International Shoe Company v. Washington, 326 U.S. at 319, 66 S.Ct. at 160, 90 L.Ed. at 104. The contacts with the forum state cannot be "isolated", "fortuitous",[14] or "attenuated".[15] There must be a substantial connection between the defendant's activities and the forum state,[16] but physical entry into the forum state is not essential. Burger King Corp. v. Rudzewicz, 471 U.S. ___, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Plaintiff's residence is not irrelevant to the inquiry, because defendant's relationship with plaintiff may enhance defendant's contacts with the forum. Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).
A person must have fair warning that an activity may subject him to foreign jurisdiction. Burger King, supra. This allows a potential defendant some assurance as to where he will be liable to suit. World-Wide Volkswagen Corporation v. Woodson, supra; Burger King, supra. The requirement of fair warning is satisfied when a defendant has purposefully directed his activities at a resident of the forum,[17] and the litigation results from foreseeable injuries arising out of or relating to those activities. International Shoe, supra; Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); Burger King, supra.
A nonresident party to a contract consummated in the forum state is subject to the forum state's in personam jurisdiction on causes of action arising out of the transaction. McGee v. International Life Ins. Co., supra; Burger King, supra. Compare Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Employee status does not insulate one from jurisdiction. Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).
When minimum contacts are present, they must be balanced with other factors to determine whether personal jurisdiction affords substantial justice, is reasonable and compatible with fair play. International Shoe Company v. Washington, supra; Schaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); World-Wide Volkswagen Corporation v. Woodson, supra; Burger King, supra; Restatement (2d) of Conflict of Laws, §§ 36, 37 (1971). Factors to be evaluated include the burden on the defendant, the forum state's interest, the plaintiff's interest, the system's interest in obtaining the most efficient resolution of controversies, and the furtherance of fundamental substantive social policies. World-Wide Volkswagen Corp. v. Woodson, supra; Burger King, supra.
To establish jurisdiction over Davis, there must be: (1) injury in Louisiana arising out of or relating to the contract; (2) a personal tort by Davis directed toward or *889 affecting Louisiana residents; and (3) no offense to fair play and substantial justice.

CONCLUSION
This contract was consummated in Louisiana when it was signed on behalf of the Bossier Bank.[18] The allegations of Westside establish minimum contacts between Davis and Louisiana, but it is admitted that Davis' activities were entirely in his capacity as an officer of Penn State.
In the Burger King case, two people who were liable to Burger King for franchise obligations had entered into a corporate relationship. The two individuals were personally liable for the corporate obligations, derived personal benefit from their interstate activities, and were primary participants in the enterprise. Here, in contrast, it is admitted that Davis was acting solely as a corporate officer and employee. Thus, the jurisdictional issue is much closer than the one resolved in Burger King.
In Calder, a reporter and editor wrote and edited an article which made them primary participants in an alleged wrongdoing, a libel, intentionally directed at a California resident. Calder emphasized that the defendants were "not charged with mere untargeted negligence."[19] On the contrary, their article had a named victim.
Calder left open the status of a "hypothetical welder",[20] employed by a corporate manufacturer, when the welder lacks control over and direct benefit from the employer's activities in the forum state. While closer to the seat of power than the hypothetical welder, Davis was not a director of Penn Square. However, he was a policy-making executive officer. As an officer of Penn Square, he is not immune from Louisiana jurisdiction but that jurisdiction must be based on his personal acts.
It is alleged that Davis was negligent in: "Failure to deliver collateral to Fidelity within a reasonable time." Davis essentially admitted his fault in this respect.[21]
It is also alleged that Davis was guilty of another failure to act, i.e., failure to warn Bossier: nonfeasance rather than malfeasance.[22] This liability is dependent on an underlying, affirmative duty imposed by contract, custom, or social policy.[23] An essential question is whether Davis had a duty to prevent these alleged injuries by proper delivery of the collateral and/or warning to Bossier.[24]
*890 Although Davis signed the contract on behalf of his employer, he admitted that he was personally involved in the transaction. He was the principal for the Bank in this transaction. Since he was the only officer of Penn Square Bank directly involved and responsible for the Bank's commitments in this Louisiana contract, Davis had a duty to see that the Bank's obligations were carried out, or, alternatively, a duty to warn the other party that these obligations were not being carried out. He had a duty to deliver the collateral and a duty to warn Bossier. Davis breached these duties and is personally liable for his negligent omissions. An employee cannot shield himself behind a corporate wall when he is the officer responsible for the corporation's acts in a particular transaction.
Since Louisiana can exercise jurisdiction over Davis, the question then becomes whether this jurisdiction would be compatible with fair play. It is obviously a burden on Davis to defend a lawsuit in Louisiana. On the other hand, Louisiana has a strong interest in seeing that the investors and the corporate entity of Westside Habilitation Center are recompensed for their losses. Plaintiffs' interests are substantial. It is alleged that Louisiana is the only forum in which all aspects of this matter can be litigated; thus, the most efficient resolution of the various controversies would lie in a Louisiana court. There is a strong social policy against allowing Davis to shield himself behind his corporate employer when he was allegedly guilty of personal negligent nonfeasance directed at residents of Louisiana. By accepting these funds from Louisiana and making various commitments in the investment agreement, Davis had fair warning that he might eventually be subject to Louisiana jurisdiction. It was more than foreseeable that Davis' failures to act, i.e., to deliver or warn, would cause injury to Louisiana residents. Davis admitted that he had been guilty of personal neglect and omission. Exercising jurisdiction over Davis in this controversy is reasonable, does not offend fair play, and affords substantial justice to the parties.
For the foregoing reasons, the judgment of the Court of Appeal is reversed and the judgment of the trial court overruling the exception to personal jurisdiction over Bert Davis, III, is reinstated. The matter is remanded to the trial court for further proceedings.
REVERSED AND REMANDED.
BLANCHE and MARCUS, JJ., dissent and assign reasons.
BLANCHE, Justice (dissenting).
I respectfully dissent.
Here we have a Rapides Parish non-profit corporation doing business with a Bossier Bank to act as trustee of funds derived from bond sales and to invest those funds in a "qualified investment." The Bank contacts a bond broker in Little Rock, Arkansas, who contacts an investment broker in California, who contacts the defendant, Bert Davis, III, who is instructed to contact the Arkansas bond broker. The investment agreement was then confected in Arkansas and signed by Davis in Oklahoma for the Penn Square Bank. Davis never had any contact with Louisiana until after the agreement was signed and that was when Bossier called Davis to confirm the amount of money which had been wired to them. Thereafter, the total contacts from Davis to Louisiana consisted of one letter and one phone call. The letter concerned the delivery of the collateral under the agreement, as did the phone call.
Davis realized no financial gain as a result of the placement of funds by Bossier Bank in Penn Square Bank. Davis did not initiate contact with the investment broker and solicit the placement of these funds. Davis did not initiate contact with the developers of Westside to solicit a deposit of the proceeds of the bond sales. Davis did not approach the Bossier Bank and solicit their deposit.
The Court of Appeal was correct in holding that the nexus between Davis as a corporate agent and this state is too tenuous *891 to support jurisdiction over him personally under the Long Arm Statute.
To support the proper exercise of jurisdiction in personam over a non-resident, there must be sufficient minimum contacts between the non-resident and the forum state to support due process and "traditional notions of fair play and substantial justice." Davis' contacts with Louisiana was too tenuous to support jurisdiction over him personally under the Long Arm Statute, and in my opinion, requiring him to come to Louisiana to defend this suit offends traditional notions of fair play and substantial justice.
For the above reasons, I respectfully dissent.
MARCUS, Justice (dissenting).
Considering the fact that Davis' only contacts with Louisiana consisted of several telephone calls and a letter, on behalf of his employer, in connection with a single banking transaction, I consider that it would offend traditional notions of fair play and substantial justice to hale him into a Louisiana court on alleged claims of negligence. Accordingly, I respectfully dissent.
NOTES
[1] Fidelity was Penn Square's correspondent bank in the area.
[2] They were taken on September 28, 1982; November 16, 1982; and August 22, 1983. The September deposition is both the earliest and the most candid of the three.
[3] There were two certificates of deposit. The smaller one, for $1,785,000, was secured by U.S. government obligations.
[4] Depo., 9/28/82, p. 40.
[5] Depo., 11/16/82, p. 21.
[6] Exhibit 2.
[7] Depo., 11/16/82, p. 39.
[8] "Q.... of all matters involved in the Penn Square Bank and all the cases, this one really upset you and bothered you the most?

"A. Yeah. I mean, this situation, you knowThis is the worst situation, mainly because it affected me, personally.
"Q. Is that the only reason you think it's the worst one, because it affected you personally?
"A. Well, no. I guess I'm more personally aware of the situation. I'm involved in the situation more. It's a disaster for me, personally, as well as for Westside and for the Bossier Bank. So, yeah, I think it's probably one It's horrible." (Depo., Bert Davis, III, 9/28/82, p. 78)
[9] 465 So.2d 196 (La.App. 3 Cir.1985).
[10] 468 So.2d 566 (La., 1985).
[11] LSA-C.C. art. 2316 provides:

"Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."
[12] LSA-R.S. 13:3201 provides:

"A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from any one of the following activities performed by the nonresident:
"(1) Transacting any business in this state.
"(2) Contracting to supply services or things in this state.
"(3) Causing injury or damage by an offense or quasi-offense committed through an act or omission in this state.
"(4) Causing injury or damage in this state by an offense or quasi-offense committed through an act or omission outside of this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in this state.
"(5) Having an interest in, using or possessing a real right on immovable property in this state.
"(6) Non-support of a child or spouse or a former spouse domiciled in this state to whom an obligation of support is owed and with whom the non-resident formerly resided in this state.
"(7) Parentage and support of a child who was conceived by the nonresident while he resided in or was in this state.
"(8) Manufacturing of a product or a component thereof which caused damage or injury in this state, if at the time of placing the product into the stream or commerce, the manufacturer could have foreseen, realized, expected, or anticipated that the product may eventually be found in this state by reason of its nature and the manufacturer's marketing practices."
[13] Louisiana State Law Institute's Comments.
[14] World-Wide Volkswagen Corporation v. Woodson, 444 U.S. 286 at 295, 100 S.Ct. 559 at 566, 62 L.Ed.2d 490 at 500 (1980).
[15] World-Wide Volkswagen Corporation v. Woodson, 444 U.S. 286 at 299, 100 S.Ct. 559 at 568, 62 L.Ed.2d 490 at 502 (1980).
[16] McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); Kulko v. California, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978).
[17] Keeton v. Hustler Magazine, Inc., supra; Brown v. Flowers Industries, Inc., 688 F.2d 328 (5 Cir., 1982), cert. den. 460 U.S. 1023, 103 S.Ct. 1275, 75 L.Ed.2d 496 (1983).
[18] Davis Depo., 9/28/82, p. 37.
[19] 465 U.S. at ___, 104 S.Ct. at 1487, 79 L.Ed.2d at 812.
[20] 465 U.S. at ___, 104 S.Ct. at 1487, 79 L.Ed.2d at 812.
[21] "Q. What entered your mind Friday afternoon?

"A. That it was the major loose end that I had left openthat had been left open, that those mortgages had not been delivered, even without documentation. (Depo., Bert Davis, III, 9/28/82, p. 76).
[22] "Q.... Did you consider calling them [people at Bossier]?

"A. Yes, I considered calling them, but I didn't." (Depo., Bert Davis, III, 9/28/82, p. 76)
[23] The pleadings imply, but do not state, that Davis made a false representation when: "he assured Jones that delivery to Fidelity [of the collateral] was imminent." (Tr. 421) This allegation falls short of showing any wrongdoing by Davis directed toward Louisiana residents. The implication of wrongdoing is insufficient. It is not alleged that the assurance was false, wrongful or resulted from Davis' personal fault.

The pleadings, in toto, indicate that Davis made a false representation when Davis advised Bossier that "collateral for the debt service reserve had been placed with Fidelity in the Oklahoma City branch of the Federal Reserve Bank of Kansas City." (Tr.788) Davis admitted in deposition that he notified Bossier the collateral was being placed with Fidelity, whereas he actually delivered copies of the notes and mortgages to Fidelity. However, Bossier was promptly advised of this fact by Fidelity.
It is argued, although not specifically alleged in the pleadings, that Davis was guilty of negligent misrepresentation and is liable for that tort. Again, it would be necessary for Davis to have a duty to these parties, which was breached. Devore v. Hobart Mfg. Co., 367 So.2d 836 (La., 1979).
[24] See Brasher v. First Nat. Bank of Birmingham, 168 So. 42, 232 Ala. 340 (1936) and Chiarella v. United States, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).