CINDY LEBLANC PUCKETT
v.
ADVANCE SPORTS, INC., PROGRESSIVE PALOVERDE INSURANCE COMPANY, AND WARREN F. MCDONALD.
No. 2009 CA 0507.
Court of Appeals of Louisiana, First Circuit.
October 26, 2009.
Not designated for Publication
ALONZO P. WILSON, JERE JAY BICE, J. ROCK PALERMO, III, Lake Charles, Louisiana, Counsel for Plaintiff-Appellant Cindy LeBlanc Puckett.
CHARLES V. GIORDANO, TASHA W. HEBERT, Metairie, Louisiana, Counsel for Defendants-Appellees Warren McDonald and Progressive Paloverde Insurance Company.
EUGENE TERK, BRUCE A. CRANNER, New Orleans, Louisiana Counsel for Defendants-Appellees Joseph Lin, Great Northern Insurance Company, and Advance Sports, Inc.
Before: PARRO, KUHN, and MCDONALD, JJ.
KUHN, J.
Plaintiff-appellant, Cindy LeBlanc Puckett, appeals a judgment that sustained defendant-appellee Joseph Lin's exceptions raising the objections of lack of personal jurisdiction and no cause of action and dismissed Ms. Puckett's claims against him individually with prejudice. We affirm that part of the judgment that sustained the exception raising the objection of lack of personal jurisdiction and dismissed the claims against Lin. We further vacate that part of the judgment that sustained the exception raising the objection of no cause of action.

I. PROCEDURAL AND FACTUAL BACKGROUND
According to the allegations of plaintiffs petition, Ms. Puckett's husband, Adam Puckett, was water skiing on a wakeboard in the Amite River on September 23, 2007, when he lost his balance and fell into the water. After the fall, Mr. Puckett did not resurface, and he drowned. When Mr. Puckett's body was recovered, he was wearing a JetPilot A-10 Attack Competition wakeboard vest ("the A-10 vest") that had "provided no flotation and [had] allowed [Mr. Puckett] to sink." Ms. Puckett filed a petition naming as defendants, Advance Sports, Inc. ("Advance Sports"), who "designed, manufactured and sold" the vest, and Joseph Lin, "the sole shareholder and chief executive officer of [Advance Sports]."[1]
The original petition, filed in January 2008, alleged these pertinent facts:

8.
The marketing of the vest, and the language printed inside the vest, communicate to users that the vest provides flotation and buoyancy to the wearer even though the product has not been approved by the U.S. Coast Guard, and ordinary users would believe that the vest would float an incapacitated or unconscious wearer at the surface.
9.
The [A-10 vest] was defective and unreasonably dangerous. The ski vest was defective in construction and design and failed to warn of its inability to float a person on the surface.
10.
The defects in the ski vest were a direct cause of the death of [Mr. Puckett]. Plaintiff specifically pleads the Louisiana Products Liability Act, La. R.S. 9:2800.53 et seq.
The second supplemental and amending petition alleged that Lin was "a resident of the full age of majority of California who may be served through the Louisiana Long Arm Statute, at 2860 California Street, Torrance, CA 90503 (c/o Advance Sports, Inc.)" and further alleged the following pertinent facts:
16.
[Lin] ... had the duty and responsibility to use reasonable care to see that [Advance Sports] did not manufacture and sell products that were unreasonably dangerous in reasonably anticipated use such as the [A-10 vest] .... This duty was owed to third parties, including [Mr. and Ms. Puckett].
...
17.
[Lin] personally breached the duties owed by him to [Mr. and Ms. Puckett] in that he failed to use reasonable care to assure that [Advance Sports] did not design, manufacture and sell products, such as the A-10 vest, that were unreasonably dangerous, and he did further fail to use due care to delegate such responsibilities to a responsible subordinate or subordinates.
In addition to the preceding allegations, plaintiffs third supplemental and amending petition also alleged in pertinent part:
18.
[Lin] knew or should have known that [Advance Sports] was manufacturing unreasonably dangerous products, including the A-10 vest....
...
20.
That [Lin's] personal fault ... was a cause-in-fact and legal cause of the death of [Mr. Puckett] and the resulting damages.
...
21.
[Lin] is personally liable for the debts and liabilities of [Advance Sports] to Plaintiff in that he is the alter ego of [Advance Sports] and he, [Advance Sports], and Sports Dimensions], Inc. constituted a `single business enterprise.'
...
The third supplemental and amending petition further alleged that Lin's personal fault and negligence included: a) the failure to take reasonable steps to see that the vest would float a user on the surface and to see that adequate warnings and instructions were placed on the vest; and b) the failure to ensure that the vest was not marketed to recreational water sport participants when he knew the vest was not safe for such use. The petition also alleged various facts to support the alter ego and single business enterprise theories of liability, including that: a) Lin is the sole shareholder, CEO, and president of Advance Sports and Sports Dimensions, Inc. ("Sports Dimensions"), who have common directors and officers with unified administrative control; b) the two corporations have similar or supplementary businesses, are inadequately capitalized, use each other's property, pay expenses of each other and of Lin, and do not follow corporate formalities; and c) employees of Sports Dimensions and Lin are utilized to provide services to Advance Sports.
During the October 27, 2008 hearing on Lin's exceptions, both parties introduced evidence. Ms. Puckett introduced excerpts of the deposition testimony of Lin and of three Advance Sports employees, Bryan R. Jellig, Rachel Boschman, and Charlie Harris, as well as answers to interrogatories by Advance Sports.[2]
According to Lin's deposition testimony, Advance Sports, whose offices are located in Vista, California, owns the license for the JetPilot product line, which includes personal flotation devices, wetsuits, and apparel. Advance Sports, who sells more than 10,000 vests annually, manufactured, marketed, and sold the vest that Mr. Puckett was wearing at the time of his death.[3] Advance Sports consults with lawyers to develop safety warnings for the competition vests. Lin did not approve the warnings that were used on the vests that Advance Sports sold. He explained that the JetPilot team, Jellig and Boschman, worked with the lawyers to develop the safety warnings that were ultimately integrated into the vests during the manufacturing process. Lin had not witnessed any safety tests being performed on the vests, and he admitted to having knowledge that the A-10 vest may not provide enough buoyancy to float a person.
Jellig testified that he worked for Advance Sports as a graphic designer. He explained that the EVA foam utilized in the competition vests was not designed to float a person. His concern in developing the vests was aesthetics and style. He had no education or training in products design, product safety, or in drafting warnings for products. He was not aware of any other employees working on the JetPilot line of products that had this type of experience.
Boschman prepared specification sheets for the various JetPilot products and worked with the factory to get the products manufactured. She was involved in the aesthetic design and fit of the competition vests. Boschman also had no training related to product design or safety warnings; her training was in fashion design, and she had prior experience working as a pattern maker.
Harris, Advance Sports' sales manager, testified that the A-10 vest was intended to be used for water activities other than wakeboarding, such as surfing, kiteboarding, and canoeing. When asked about the purpose of the vest, he explained it was an "extremely fashionable" vest to wear for water sports.
Advance Sports' answers to interrogatories established that the A-10 vest was not a United States Coast Guard approved personal flotation device, and it was neither designed nor required to meet any buoyancy requirements.
Based on this evidence, the trial court found that although Advance Sports had placed its product in the stream of commerce and had exposed itself to the jurisdiction of the Louisiana courts, Lin had not taken actions within the state of Louisiana in his individual capacity. The court further found no basis to pierce Advance Sports' corporate veil in order to attain personal jurisdiction over Lin in the state of Louisiana. The trial court also reasoned that Lin owed no personal duty to the Pucketts and that the petition failed to state a cause of action against Lin as a corporate officer for the alleged wrongdoing of the corporation. Thus, the trial court sustained both exceptions and dismissed Ms. Puckett's claims against Lin with prejudice. Ms. Puckett has appealed, asserting that the trial court erred in sustaining the exceptions and erred in failing to grant her an opportunity to amend her petition.

II. ANALYSIS
To support her claim of personal jurisdiction over Lin, Ms. Puckett asserts initially that jurisdiction over Advance Sports should be imputed to Lin as its alleged alter ego and that Lin should be personally liable for the debts of Advance Sports under the "single business enterprise" theory. Further, Ms. Puckett urges that Lin's personal fault caused the death of a Louisiana resident and that Lin was the policy-making owner/director/officer of Advance Sports, who was personally responsible for its products being marketed nationally. She asserts Lin knew or should have known that he was selling vests nationally, he knew of the danger created by the sale and use of the vest, and he knew that his fault was likely to cause damage nationwide, including within Louisiana. She contends these facts meet the "minimum contacts" required to support personal jurisdiction over Lin as an "officer, agent, or employee [that] may be held individually liable for both a breach of the general duty to exercise due care so as to avoid injury to third persons, and for breach of a duty arising solely because of his employment relationship."
A court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and with the Constitution of the United States. La. C.C.P. art. 6(B). Under Louisiana's long-arm statute, La. R.S. 13:3201, personal jurisdiction over a nonresident defendant extends to the limits allowed by due process.[4] This due process requirement has evolved into a two-part test. Southeast Wireless Network, Inc. v. U.S. Telemetry Corp., 06-1736, p. 4 (La. 4/11/07), 954 So.2d 120, 124. In order to subject a nonresident defendant to personal jurisdiction, the defendant must have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); Southeast Wireless Network, Inc., 06-1736 at p. 4,954 So.2d at 124-25.
In Southeast Wireless Network, Inc., 06-1736 at pp. 4-6, 954 So.2d at 125, the Louisiana supreme court summarized the applicable jurisprudence referencing the two-part test and the relevant burdens of proof:
The "minimum contacts" prong is satisfied by a single act or actions by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). This "purposeful availment" must be such that the defendant "should reasonably anticipate being haled into court" in the forum state. Ruckstuhl v. Owens Corning Fiberglas Corporation, XXXX-XXXX (La. 4/13/99), 731 So.2d 881, cert, denied, 528 U.S. 1019, 120 S.Ct. 526, 145 L.Ed.2d 407 (1999). This part of the test ensures that the defendant will not be haled into a jurisdiction solely as a result of a random, fortuitous or attenuated contact, or by the unilateral activity of another party or a third person, de Reyes [v. Marine Mgt. and Consulting, 586 So.2d 103, 106 (La.1991)]; Alonso v. Line, 2002-2644 (La. 5/20/03), 846 So.2d 745, cert, denied, 540 U.S. 967, 124 S.Ct. 434, 157 L.Ed.2d 311 (2003). If the defendant deliberately engages in significant activities within a state, or creates continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there. Because his activities are shielded by the benefits and protections of the forum's laws, it is presumptively not unreasonable to require the defendant to submit to the burdens of litigation in that forum, de Reyes, 586 So.2d at 106.
The second part of the due process test centers around the fairness of the assertion of jurisdiction. Once minimum contacts are established, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with `fair play and substantial justice." Burger King Corp., 471 U.S. at 476, 105 S.Ct. at 2184. Thus, once the plaintiff meets his burden of proving minimum contacts, "a presumption of reasonableness of jurisdiction arises" and "the burden then shifts to the opposing party to prove the assertion of jurisdiction would be so unreasonable in light of traditional notions of fair play and substantial justice as to overcome the presumption of reasonableness created by the defendant's minimum contacts with the forum." de Reyes, 586 So.2d at 107. In determining this fundamental fairness issue, the relevant considerations are: (1) the defendant's burden; (2) the forum state's interest; (3) the plaintiffs interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies. Ruckstuhl, 731 So.2d at 890. (Emphasis added).
Although Ms. Puckett asserts that personal jurisdiction over Advance Sports should be imputed to Lin, she failed to introduce any evidence at the hearing to support her claims that Lin was Advance Sports' alter ego or that a single business enterprise existed. The record contains no evidence of fraud or deceit by Lin acting through the corporation or any evidence that Advance Sports disregarded requisite corporate formalities to the extent that the corporation ceased to be distinguishable from Lin. See Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164, 1168 (La. 1991).[5] Likewise, the record contains no evidence establishing that Lin, Sports Dimension, and Advance Sports should be considered a single business enterprise as a basis for imputing jurisdiction. See Green v. Champion Ins. Co., 577 So.2d 249, 257-58 (La. App. 1st Cir.), writ denied, 580 So.2d 668 (La. 1991). Although Ms. Puckett made many allegations to support these theories, the exception must be resolved on the evidence presented at the trial of the exception rather than on the allegations of the petition. See Price v. Roy O. Martin Lumber Co., 04-0227, p. 13 (La. App. 1st Cir. 4/27/05), 915 So.2d 816, 825, writ denied, 05-1390 (La. 1/27/06), 922 So.2d 543.
Ms. Puckett also asserts that Lin directed that Advance Sports' products be marketed nationwide and that Lin knew of the danger created by the sale of the vest but chose to ignore it, irresponsibly delegating responsibility for product warnings to personnel with inadequate training. She posits that it was foreseeable that Lin's fault would result in harm to Louisiana residents and that Lin cannot shield himself behind Advance Sports' corporate wall (relying on Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), and Fryar v. Westside Habilitation Center, 479 So.2d 883 (La. 1985)).
In Calder, a professional entertainer who lived and worked in California sued two Florida residents, a reporter for the National Enquirer and the president/editor of the National Enquirer. Calder, 465 U.S. at 785. The entertainer claimed she had been libeled in an article written and edited by the defendants. Id. at 785. The reporter, who had written the first draft of the article frequently travelled to California on business, and the parties disputed whether he had made one trip to California in connection with the article, but otherwise, he had done most of his research in Florida, relying on phone calls to sources in California for the information contained in the article. Id. at 785. The president/editor had travelled to California only twice, both trips unrelated to the article, and he had edited the article into its final form, declining to print a retraction when requested by the entertainer. Id. at 786.
In analyzing the "minimum contacts" prong of the due process test, the Calder court found it was proper to focus on "the relationship among the defendant, the forum, and the litigation" and found that the plaintiff/entertainer was the "focus of the activities of the defendants out of which the suit arises." Id. at 788. The United States Supreme Court found that the reporter and president/editor were not charged with "mere untargeted negligence," but noted rather that the defendants' actions were intentional and expressly aimed at California, knowing that the brunt of the injury would be felt by the entertainer in the State in which she lived and worked and wherein the National Enquirer had its largest circulation. Id. at 789-90. Based on these facts, the Calder court found that the defendants must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article. Id. at 790.
Addressing the defendants' status as employees, the Calder court reasoned that such status did not insulate the defendants from jurisdiction. Id. at 790. It explained, however, that each defendant's contacts with the forum state must be assessed individually and "[t]he requirements of International Shoe ... must be met as to each defendant over whom a state court exercises jurisdiction." Calder, 465 U.S. at 790, quoting Rush v. Savchuk, 444 U.S. 320, 332, 100 S.Ct. 571, 579, 62 L.Ed.2d 516 (1980). The Calder court found that jurisdiction over the defendants in California was proper based on their intentional conduct in Florida calculated to cause injury to plaintiff in California. Calder, 465 U.S. at 790.
Fryar also involved a defendant/employee that had directed his activities towards Louisiana residents. Fryar, 479 So.2d at 884. In Fryar, the plaintiff filed suit against a vice president of a bank who negotiated a contract between an Oklahoma bank and a Louisiana bank, which had invested money in the Oklahoma bank on behalf of a Louisiana trustee. Id. at 884. The Oklahoma bank failed, and the Louisiana trustee lost its investment. Id. at 884. Plaintiff alleged that the defendant had regularly solicited business in Louisiana, had sold certificates of deposit to Louisiana residents, and had directly corresponded with Louisiana customers regarding their purchases of certificates of deposit issued by the bank. Id. at 886. The Fryar court determined that jurisdiction over the individual officer of the Oklahoma bank was proper. The contract giving rise to the suit was consummated in Louisiana, the defendant was the principal for the Oklahoma bank in the transaction, and he was the only officer of the bank directly involved and responsible for the bank's commitments under the contract. Although the defendant's activities were in his capacity as an officer of the bank, the court found that the officer admitted he was personally involved in the transaction and was guilty of personal neglect and omission. Id. at 889-90. The court also reasoned that by accepting funds from Louisiana, he had fair warning that he might eventually be subject to Louisiana jurisdiction. Id. at 890.
We find both Calder and Fryar distinguishable from the instant case. Both involved tortious activity that was "purposefully directed" to the forum state, a purposefulness not present in this case. See Kostuch v. Southtrust Bank of Alabama, N.A., 665 F.Supp. 474, 477 (M.D. La. 1987), aff'd, 842 F.2d 328 (5th Cir. 1988) (table). Further, although Ms. Puckett argues that injury in Louisiana was forseeable, the foreseeability of causing injury in the forum state is not sufficient to support jurisdiction. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). Based on the evidence presented, we find no basis that Lin "should reasonably anticipate being haled into court" in Louisiana; the evidence does not establish that Lin, himself, purposefully directed any activity towards Louisiana. Thus, Ms. Puckett failed to meet her burden of proving minimum contacts, and the trial court did not err in finding that it lacked personal jurisdiction over Lin.
Ms. Puckett also contends she should have been afforded an opportunity to amend her petition to allege additional facts to support personal jurisdiction over Lin. We acknowledge that La. C.C.P. art. 932A requires that a party be given an opportunity to amend his/her petition when the grounds of a declinatory exception can be removed by amendment. Louisiana Code of Civil Procedure article 932B clearly provides that a demand should be dismissed, however, if the grounds of the objection cannot be removed. Thus, in instances where there is no way in which a petition can be amended to provide a court with jurisdiction over a claim, the trial court is not required to allow an amendment. Triplett v. Board of Elementary and Secondary Educ, 09-0691, p. 3 (La. App. 1st Cir. 7/13/09), ___ So.3d ___.
Based on the evidence presented in the instant case, we find the grounds of the objection cannot be removed. Where a plaintiff has the opportunity but fails to offer sufficient evidence at the hearing of a declinatory exception to controvert its grounds, dismissal of the petition is proper. Vallejo Enterprise, L.L.C. v. Boulder Image, Inc., 05-2649, p. 8 (La. App. 1st Cir. 11/3/06), 950 So.2d 832, 838. Accordingly, the trial court did not err in refusing to allow plaintiff an opportunity to amend.
Because we have determined that the trial court did not have personal jurisdiction over Lin, we also conclude that the trial court did not have jurisdiction to determine whether Ms. Puckett's petition stated a cause of action against Lin. See La. C.C.P. arts. 1 and 6. Accordingly, we vacate that portion of the trial court's judgment sustaining Lin's exception raising the objection of no cause of action.

III. CONCLUSION
For these reasons, we affirm that portion of the trial court's judgment that sustained Lin's exception raising the objection of lack of personal jurisdiction and dismissed Ms. Puckett's claims against Lin with prejudice, and we vacate that portion of the trial court's judgment that sustained Lin's exception raising the objection of no cause of action. Appeal costs are assessed against Ms. Puckett.
AFFIRMED IN PART; VACATED IN PART.
NOTES
[1] Other defendants were also named but are not relevant to this appeal. Advance Sports was named as a defendant in the original petition, and Lin was named as a defendant in a supplemental and amending petition.
[2] Lin introduced various affidavits, which were accepted into evidence over Ms. Puckett's objection. On appeal, Ms. Puckett has assigned error to the trial court's admission of these affidavits. We pretermit a discussion of this assignment of error because we need not consider these affidavits to resolve this appeal.
[3] Harris' deposition testimony established that approximately 4,000 of the vests sold were A-10 vests, the type worn by Mr. Puckett.
[4] Louisiana Revised Statutes 13:3201 provides:

A. A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from any one of the following activities performed by the nonresident:
(1) Transacting any business in this state.
(2) Contracting to supply services or things in this state.
(3) Causing injury or damage by an offense or quasi offense committed through an act or omission in this state.
(4) Causing injury or damage in this state by an offense or quasi offense committed through an act or omission outside of this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in this state.
(5) Having an interest in, using or possessing a real right on immovable property in this state.
(6) Non-support of a child, parent, or spouse or a former spouse domiciled in this state to whom an obligation of support is owed and with whom the nonresident formerly resided in this state.
(7) Parentage and support of a child who was conceived by the nonresident while he resided in or was in this state.
(8) Manufacturing of a product or component thereof which caused damage or injury in this state, if at the time of placing the product into the stream of commerce, the manufacturer could have foreseen, realized, expected, or anticipated that the product may eventually be found in this state by reason of its nature and the manufacturer's marketing practices.
B. In addition to the provisions of Subsection A, a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and of the Constitution of the United States.
[5] Some of the factors considered when determining whether to apply the alter ego doctrine include, but are not limited to: 1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings. Riggins, 590 So.2d at 1168.